997 So.2d 724 (2008)
In the Matter of the INTERDICTION OF Kelly Carl DUGAS.
No. 2008 CA 0900.
Court of Appeal of Louisiana, First Circuit.
November 3, 2008.
*725 Brian J. Prendergast, Wendy L. Edwards, Baton Rouge, Louisiana, Thomas J. Frierson, Livingston, Louisiana, for Appellant, Dana Kelly Dugas.
Ernest M. Forbes, Denham Springs, Louisiana, for Appellee, Lisa Marie Thacker.
Rodney N. Erdey, Denham Springs, Louisiana, for Appellee, Kelly Carl Dugas.
Before PARRO, McCLENDON, and WELCH, JJ.
McCLENDON, J.
In this appeal, the curator father of an adult interdict challenges the judgment of the trial court allowing the undercurator mother to continue daily visitation with the interdict and terminating the services of the interdict's physical therapist. For the following reasons, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Dana Kelly Dugas (Kelly) and Lisa Marie Thacker (Lisa) were once married, but divorced and have since each remarried. Kelly and Lisa had two sons together, Kelly Cart (K.C.) and Steven. On December 28, 2005, nineteen-year-old K.C. was severely injured in an automobile accident. As a result, K.C. suffers from a post-traumatic brain injury, which has rendered him in a conscious, but semi-vegetative state, totally dependent on others for care.
On January 26, 2006, Kelly filed a petition for the interdiction of K.C, seeking to be named curator and requesting that his present wife, Lisa Dugas, be appointed undercurator. The trial court signed an ex parte order naming Kelly as the temporary curator pending a contradictory hearing. Lisa and K.C.'s then wife, Chelsea Dugas (Chelsea), filed a petition of intervention, requesting that Lisa be appointed curator and that Chelsea be appointed undercurator. Thereafter, counsel was appointed by the trial court to represent K.C. Pursuant to an agreement reached by the parties, a Stipulated Judgment and Interim Order was rendered in open court on May 3, 2007, and signed on June 1, 2007. The judgment interdicted K.C. and appointed Kelly Dugas as the curator and Lisa Thacker as the undercurator. The *726 judgment also provided that K.C. would reside with Kelly and that Lisa would be allowed scheduled daily visitation; that the parties have equal access to all medical information regarding K.C.; that they keep each other advised of K.C.'s medical condition and that both would be entitled to participate in all medical appointments and discussions about K.C. with any health care provider; and that Kelly and Lisa attend and participate in counseling with Dr. Mark Crosby, a court-appointed counselor.
On July 2, 2007, Kelly filed a rule for the termination of Lisa's visitation with K.C., asserting that she failed to follow the suggestions of the counselor and that her extensive visitation with K.C. impedes his progress. Lisa opposed the rule. On September 12, 2007, Lisa filed a rule for contempt, alleging that Kelly violated the stipulated judgment in keeping her from seeing her son, in keeping her from participating in K.C.'s medical appointments, in refusing to keep her advised of K.C.'s medical condition, and in failing to follow the counselor's recommendations. Lisa also sought to be appointed as K.C.'s curator and requested that the services of Cheryl Jeane, the physical therapist, be terminated.
After a hearing on the rules, judgment was rendered on November 13, 2007, and signed on December 12, 2007. The judgment continued Lisa's daily visitation, provided that the parties could travel with K.C. once they obtained certifiable "transfer training," ordered that Kelly and Lisa maintain a written journal regarding K.C., found Kelly in contempt of court for his failure to obey the stipulated judgment, terminated the therapy services of Ms. Jeane, and dismissed all other claims.
Kelly has appealed and asserts that the trial court was manifestly erroneous in allowing the continued visitation of K.C. by Lisa and in terminating the services of the physical therapist.

STANDARD OF REVIEW
It is well-settled that an appellate court cannot set aside a trial court's factual findings in the absence of manifest error or unless the findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced it would have weighed the evidence differently had it been the trier of fact. Id. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State, DOTD, 617 So.2d 880, 882 (La.1993).

APPLICABLE LAW
A court may order the full interdiction of a natural person of the age of majority who due to an infirmity is unable consistently to make reasoned decisions regarding the care of his person and property, or to communicate those decisions, and whose interests cannot be protected by less restrictive means. LSA-C.C. art. 389. Further, LSA-C.C. art. 392 provides, in pertinent part:
The court shall appoint a curator to represent the interdict in juridical acts and to care for the person or affairs of the interdict, or any aspect of either. The duties and powers of a curator commence upon his qualification. In discharging his duties, a curator shall exercise reasonable care, diligence, and prudence and shall act in the best interest of the interdict.
*727 The court shall also appoint an undercurator to discharge the duties prescribed for him by law. In discharging his duties, an undercurator shall exercise reasonable care, diligence, and prudence and shall act in the best interest of the interdict. LSA-C.C. art. 393. Louisiana Code of Civil Procedure article 4565 contains the provisions setting forth the particular duties of undercurators.[1]

DISCUSSION
In the present matter, Kelly is attempting to terminate Lisa's visitation of K.C. He asserts that there is no provision in the law entitling an adult to court-ordered visitation with another adult, citing In re Interdiction of Greenblatt, 01-300, p. 4 (La.App. 5 Cir. 10/17/01), 800 So.2d 922, 924, in support thereof. Greenblatt is clearly distinguishable on its facts as it involved a parent, who was neither the curator nor undercurator, seeking visitation of her interdicted adult daughter.[2]
In contrast in this case, the parents of the interdict hold the positions of curator and undercurator. Louisiana Civil Code articles 392 and 393 mandate that a curator and undercurator act in the best interest of the interdict. While we agree that there is no clear statutory authority whereby a parent is entitled to visitation of an adult child, the salient issue before us is the best interest of the interdict. Thus, the question to be answered in this case is whether Lisa's continued visitation of K.C. is in his best interest.
It is undisputed that Kelly and Lisa do not get along and that their relationship has been tumultuous and acrimonious. However, it is also undisputed that both parents love their son and that the best interest of K.C. is paramount. Lisa asserts that Kelly has refused to communicate and cooperate and is trying to shut her out of K.C.'s life, although she and K.C. have always been close and she was always the domiciliary parent when he was a minor. Lisa contends that Kelly has tried to keep her from her son in a variety of ways, including the false pretense that her visits were upsetting to K.C. Kelly argues that Lisa's visitations have in fact caused K.C. to become agitated and combative, causing his regression and necessitating this legal action to protect K.C.'s best interest.
Dr. Michael Romaguera, an expert in family medicine and K.C.'s primary physician, testified that K.C. is in very good shape for his condition and that Kelly and *728 his wife are providing excellent care. He stated that with home care, K.C. is in the best situation possible. Dr. Romaguera was of the opinion that K.C. understands, as he reacts appropriately to jokes, to pain, and to distress. Dr. Romaguera also testified that K.C.'s mental ability is not diminished and, if given the proper resources, K.C. would be able to communicate. However, K.C.'s brain injury affects his ability to speak, swallow, walk, and talk. When K.C. becomes agitated, his spasticity intensifies and worsens.
Dr. Romaguera recognized that there has been a lot of tension between the families of K.C.'s parents and acknowledged that the information he has received has been from the therapists. Specifically, with regard to Lisa's visitations, Dr. Romaguera stated:
I think it would be excellent to have her visit as much as she can, but not in the presence of the therapists or after therapy. I think the therapy should come first particularly since we've got report, after report, after report that it is a distraction for him, and so I have no problems with her visiting as long as it is not interfering with the therapy.
Dr. Mark Crosby, an expert in family psychology, counseling, and mediation, had several counseling sessions with Lisa and Kelly and also saw them individually. His desire was to create some communication between them that would benefit K.C. However, this ultimately proved unsuccessful. When K.C.'s condition worsened, Kelly called Dr. Crosby. Based on what Kelly told him, Dr. Crosby asked Lisa to decrease her visits, but she refused. According to Dr. Crosby, Kelly did not want to help Lisa, and Lisa did not want to listen to any recommendations. Dr. Crosby's concern was that Lisa was not willing to even try to find out if she might be a cause in K.C.'s regression in his therapy. That refusal kept Kelly angry and upset. Dr. Crosby acknowledged that the information that Lisa's visits upset K.C. was initially from Kelly, but then he spoke with K.C.'s physical and speech therapists, who both believed that Lisa's involvement was keeping K.C. from getting better. When asked, Dr. Crosby recognized that K.C.'s medications were a "reasonable variable" that might have an effect on K.C.'s improvement. Also, physical therapy was a reasonable variable, as it can be painful. Further, considering K.C.'s condition, there was a strong possibility that there would be times when he would just have a bad day. Dr. Crosby also opined that if K.C. overheard anything about this case, he could become agitated.
Cheryl Jeane was K.C.'s physical therapist assigned by the home health care company. Accepted as an expert in physical therapy, Ms. Jeane testified that she saw K.C. two to three times a week for thirty minutes to an hour. She testified that K.C. was progressing in his therapy, but then regressed, and it was not until Lisa's visits were decreased that K.C. again showed improvement. On cross-examination, Ms. Jeane stated that Lisa was present for K.C.'s therapy sessions a couple of times right after K.C. got out of the hospital, but Lisa did not participate. Lisa was also present at the beginning of a therapy session in June of 2007 and was asked to leave. Those were the only times Ms. Jeane could remember when Lisa was present during therapy. Ms. Jeane believed that there was a court order that Lisa was not to be present during therapy. In her opinion, Lisa is an issue. Ms. Jeane stated that she has never talked with Lisa about K.C. and will only talk to her if Lisa pays her $300. In contrast, because K.C. is at Kelly's home, she has spoken regularly with Kelly or his wife and writes them notes about K.C.'s progress. She *729 agreed that negative comments about Lisa have been made to her. The speech therapist, Gwen Angelos, testified that she never met with Lisa, although Lisa called her to set up a meeting.
Conversely, Lisa, as well as her husband, her parents, her other son, her sister, and her niece, all testified that K.C. seems happy to see his mother and seems not to want her to leave when it is time to go. Lisa's son, Steven, testified that K.C. at first might be upset, but calms down in a few minutes. He stated K.C. is glad to see his mother. Lisa's cousin testified that there are days that K.C. appears tired.
In its oral reasons, the trial court determined that after cutting Lisa's visitation back in an interim order, there was no evidence that K.C.'s condition improved or changed. The court therefore concluded that Lisa's presence was not affecting or upsetting K.C. We find that a reasonable factual basis exists in the record for the trial court's conclusion that it was not necessarily Lisa's presence that was affecting K.C., and accordingly, we find no manifest error.
Additionally, we cannot say that the trial court was clearly wrong in finding that it was in the best interest of K.C. to terminate the services of Ms. Jeane. The trial court found Ms. Jeane to be angry and defensive at trial. It concluded that the physical therapist became too personal and that her actions upset K.C. The court specifically determined that asking K.C. whether he was upset because his mother was present was itself upsetting to K.C. Furthermore, Dr. Romaguera wrote a letter on August 8, 2006, containing recommendations for K.C.'s continued progress and to maintain his stable environment. Among the recommendations was the termination of all negative and derogatory acts and statements in the presence of K.C. This recommendation was incorporated into a court order signed on August 11, 2006. Accordingly, we find no manifest error in the termination of Ms. Jeane.

CONCLUSION
For the above reasons, we affirm the judgment of the trial court. The costs of this appeal are assessed to Dana Kelly Dugas.
AFFIRMED.
NOTES
[1] Louisiana Code of Civil Procedure article 4565 provides, in pertinent part:

B. The undercurator shall:
(1) Notify the court when the curator has failed to qualify timely for office.
(2) Have free access to the interdict and to all records relating to the interdict relevant to his office.
(3) Review all accounts and personal reports filed by the curator.
(4) Notify the court when he has reason to believe that the curator has failed to perform any duties imposed by law, including the duties to file necessary accounts and personal reports, and to maintain adequate security.
(5) Approve or disapprove any transactions that require his concurrence.
(6) Move to appoint a successor for a curator who becomes disqualified or whose office terminates.
C. The undercurator shall have no duties, either express or implied, other than those set forth in this Article and in Civil Code Article 393.
[2] Additionally, the Greenblatt decision was based on the law as it existed prior to the 2000 amendment to Louisiana's code articles on interdiction. However, the amendment to the interdiction articles does not affect the statement in Greenblatt that there is no statutory authority entitling an adult to court-ordered visitation with another adult.